**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 12-2173

JAMES OWENS,

Plaintiff - Appellant,

v.

BALTIMORE CITY STATE'S ATTORNEYS OFFICE; MARVIN BRAVE, Individually and in his Official Capacity as an Assistant of the Baltimore City State's Attorneys Office; BALTIMORE CITY POLICE DEPARTMENT; GARY DUNNIGAN, Individually and in his Official Capacity as an Officer and Detective of the Baltimore City Police Department; JAY LANDSMAN, Individually and in his Official Capacity as an Officer and Detective of the Baltimore City Police Department; THOMAS PELLIGRINI, Individually and in his Official Capacity as an Officer and Detective of the Baltimore City Police Department,

Defendants - Appellees,

and

MAYOR AND CITY COUNCIL OF BALTIMORE,

Defendant.

Appeal from the United States District Court for the District of Maryland, at Baltimore.  George L. Russell III, District Judge. (1:11-cv-03295-GLR)

Argued:  January 28, 2014      Decided:  September 24, 2014

Before TRAXLER, Chief Judge, and MOTZ and WYNN, Circuit Judges.

Affirmed in part, vacated in part, and remanded by published opinion. Judge Motz wrote the opinion, in which Chief Judge Traxler concurs as to Parts III., IV.A., and V. and dissents as to Parts II. and IV.B., and Judge Wynn concurs, except for Part III. Chief Judge Traxler and Judge Wynn each wrote a separate opinion concurring in part and dissenting in part.

---

**ARGUED**: Charles N. Curlett, Jr., LEVIN & CURLETT LLC, Baltimore, Maryland; Laura Ginsberg Abelson, BROWN, GOLDSTEIN & LEVY, LLP, Baltimore, Maryland, for Appellant. Daniel C. Beck, BALTIMORE CITY LAW DEPARTMENT, Baltimore, Maryland; Michele J. McDonald, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellees. **ON BRIEF**: Joshua R. Treem, BROWN, GOLDSTEIN & LEVY, LLP, Baltimore, Maryland, for Appellant. Douglas F. Gansler, Attorney General, H. Scott Curtis, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland; George A. Nilson, BALTIMORE CITY LAW DEPARTMENT, Baltimore, Maryland, for Appellees.

---

DIANA GRIBBON MOTZ, Circuit Judge:

James Owens brought this action under 42 U.S.C. § 1983 against the Baltimore City State's Attorney's Office, an assistant State's Attorney, the Baltimore City Police Department, and several Baltimore City police officers. In his complaint, Owens alleges that the defendants violated his constitutional rights by intentionally withholding exculpatory evidence during his 1988 trial for the rape and murder of Colleen Williar. The district court dismissed the complaint in its entirety against all defendants on statute-of-limitations grounds. In the alternative, the court held that the Baltimore City State's Attorney's Office enjoyed sovereign immunity, the individual police officers enjoyed qualified immunity, and Owens's cause of action against the Baltimore City Police Department failed to state a claim on which relief could be granted. For the reasons that follow, we affirm in part, vacate in part, and remand the case for further proceedings consistent with this opinion.

I.

Owens appeals the dismissal of his complaint for failure to state a claim. Accordingly, we recount the facts as alleged by Owens in his complaint, accepting as true all well-pleaded

3

facts.  See Minor v. Bostwick Labs., Inc., 669 F.3d 428, 430 n.1 (4th Cir. 2012).

## A.

In the early morning hours of August 2, 1987, Colleen Williar was raped, robbed, and murdered in the second-floor bedroom of her Baltimore City apartment.  The following day, one of Williar's neighbors, James Thompson, contacted the city police department to inquire about a reward it had offered for information relating to Ms. Williar's death.  Thompson claimed that he had found a knife outside of Ms. Williar's apartment the previous evening, which he had carried home and cleaned before realizing its connection to the crime.  Over the course of Thompson's conversation with police, however, it became apparent that Thompson had not simply "happened" on the knife, as he originally claimed.  Rather, in response to questioning from Officers Thomas Pelligrini, Gary Dunnigan, and Jay Landsman (collectively, "the Officers"), Thompson asserted that he had retrieved the knife at the behest of his friend, James Owens. The Officers executed a search warrant at Owens's apartment, but found no physical evidence linking Owens to the crime.  Even though the search was fruitless, police arrested Owens on the basis of Thompson's statement.  A grand jury then indicted Owens for Ms. Williar's murder, rape, and burglary.

4

On the eve of Owens's trial, Assistant State's Attorney ("ASA") Marvin Brave, the prosecutor assigned to Owens's case, began to question the veracity of Thompson's version of events. When ASA Brave raised these concerns with Thompson, the witness retracted his statement and offered another explanation for the knife's acquisition. This time, Thompson stated that the knife belonged to <u>him</u>, but he claimed that it had gone missing after Owens visited Thompson at his home. The day after Ms. Williar's murder, Owens assertedly returned the knife to Thompson, who noticed blood on the weapon's blade and handle. When Thompson questioned Owens about the origin of the blood, Owens denied using the weapon and told Thompson to keep quiet about it.

At trial, ASA Brave presented only this third version of events to the jury. Brave never informed defense counsel about Thompson's earlier accounts, and thus, when cross-examining Thompson, defense counsel was unaware that the witness had changed his story several times over the course of the investigation.

Nevertheless, defense counsel apparently cast enough doubt on Thompson's testimony to prompt ASA Brave to seek out additional evidence of Owens's guilt. To this end, mid-trial, ASA Brave ordered testing of a pubic hair found on Ms. Williar's body. When the results were returned, however, they indicated that Thompson -- not Owens -- matched the sample. Concerned

5

that Thompson was involved in the crimes, ASA Brave instructed the Officers to reinterrogate Thompson.

At ASA Brave's direction, Officers Pelligrini, Dunnigan, and Landsman brought Thompson into the stationhouse and questioned him for two hours. The Officers accused Thompson of lying on the witness stand, warned him that he "was in a lot of trouble," and asserted that he could be charged with a crime for his misrepresentations to the jury. After receiving their warnings, Thompson stated that he wanted to change his story yet again. In fact, over the course of the two-hour interview, Thompson changed his story five additional times.

In his first new attempt, Thompson told the Officers that he and Owens had broken into Ms. Williar's apartment on the day of the murder only to find Ms. Williar already dead in her bedroom. When the Officers replied that they did not believe him, Thompson offered another iteration. This time, he contended that Owens had raped and murdered Ms. Williar upstairs while Thompson waited downstairs in the living room. The Officers responded that there was evidence that Thompson had been on the second floor, and thus, his amended account could not be true. After this prompt, Thompson admitted that he had been on the second floor, but insisted that he had hidden in the bathroom during Owens's crimes. The Officers again rejected Thompson's story, stating that investigators had found physical

6

evidence of Thompson's presence in Ms. Williar's bedroom. In response, Thompson admitted that he had been in the bedroom while Owens raped and killed Ms. Williar, but he insisted that he had refused to participate in any assault. At this point, the Officers informed Thompson that his pubic hair had been found on Ms. Williar. Faced with the forensic evidence, Thompson offered a fifth version of events. In this account, Thompson claimed that he and Owens had broken into Ms. Williar's apartment with the intent to steal her jewelry. When the pair found the victim alone in her bedroom, Owens raped and killed her, while Thompson masturbated at the foot of her bed.

After the Officers elicited this latest account, Officer Landsman told ASA Brave about Thompson's final version of events. None of the Officers disclosed that Thompson had offered several other accounts of what happened, all of which differed dramatically from the version of events related to ASA Brave as well as from the physical evidence.

Following his conversation with the Officers, ASA Brave immediately called Thompson back to the witness stand and had him share with the jury his new account of what happened. However, because only the Officers knew of the inconsistencies in Thompson's statements, neither ASA Brave nor defense counsel questioned Thompson about the four inconsistent versions of the story that the witness had offered before he settled on his

final account. Moreover, neither ASA Brave nor the Officers told defense counsel about the discovery of Thompson's pubic hair. Indeed, when defense counsel inquired about whether there had been forensic testing of the hair, ASA Brave represented to the court that "there [hadn't] been any match made" between the sample and a suspect.[1]

The jury convicted Owens of burglary and felony murder, and the trial court sentenced him to life imprisonment without the possibility of parole. Owens filed an unsuccessful appeal, and, over the course of the next two decades, several unsuccessful state-court petitions for post-conviction relief. In 2006, however, a state court granted Owens's request for post-conviction DNA testing. The results were returned some months later and indicated that Owens's DNA did <u>not</u> match the blood and semen evidence found at the scene of the crime.

On June 4, 2007, a state court granted Owens's "petition to reopen his Post Conviction Proceeding" and ordered that "by agreement of Counsel and this Honorable Court, . . . Petitioner

---

[1] Owens also alleges that ASA Brave withheld impeachment evidence with respect to a different witness: Larry Oliver, Owens's cellmate. Specifically, Owens asserts that ASA Brave intentionally withheld the fact that he had promised leniency to Oliver, who testified that Owens confessed to him in their jail cell. Because the issues involved in this asserted nondisclosure are identical to those involved in ASA Brave's nondisclosures regarding Thompson and the DNA evidence, we focus only on those facts for the sake of simplicity.

8

shall be granted a new trial." During the next sixteen months, Owens remained in state prison awaiting retrial. On October 15, 2008, the State's Attorney entered a nolle prosequi, dropping the charges against him. On that date, after Owens had spent more than twenty years in prison, the state court ordered him released from incarceration.

B.

On October 12, 2011, a few days before the three-year anniversary of the nolle prosequi, Owens filed this action under 42 U.S.C. § 1983 against the Mayor and City Council of Baltimore, the Baltimore City State's Attorney's Office, ASA Brave, the Baltimore City Police Department ("BCPD"), and Officers Pelligrini, Dunnigan, and Landsman. In his complaint, Owens alleges that the defendants violated his constitutional rights by intentionally and in bad faith withholding exculpatory and impeachment evidence at his 1988 trial.

All defendants moved to dismiss the complaint. The Baltimore City State's Attorney's Office asserted that it was not an entity amenable to suit, and that even if it were, it was an "arm of the State," immune from liability. The individual Officers, the BCPD, and ASA Brave all moved to dismiss on statute-of-limitations grounds. Alternatively, the individual Officers asserted that qualified immunity protected them from

9

suit, and the BCPD maintained that Owens failed to state a claim on which relief could be granted.

After Owens voluntarily dismissed the claims against the Mayor and City Council of Baltimore, the district court, in an oral ruling, dismissed the claims against the other defendants. The court initially determined that Owens's claims were time barred because the limitations period for his causes of action commenced when the state court granted Owens's request for a new trial, not (as Owens claimed) on the date that prosecutors entered the nolle prosequi. Although the limitations issue disposed of all of Owens's claims, the court went on to briefly address the defendants' alternative grounds for dismissal. In a series of rulings, the court determined that the Baltimore City State's Attorney's Office was entitled to sovereign immunity, that the individual Officers and the BCPD were entitled to qualified immunity, and that Owens's complaint failed to state a claim against the BCPD. Owens noted a timely appeal.

We review a district court's grant of a motion to dismiss de novo. Mylan Labs., Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir. 1993). At this stage in the proceedings, we "accept as true all of the factual allegations contained in the complaint," and "draw all reasonable inferences in favor of the plaintiff." E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 440 (4th Cir. 2011). To prevail, Owens must "state a claim

10

to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (emphasis added and internal quotation marks omitted). A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.

II.

We first consider whether the applicable statute of limitations bars all of Owens's claims.

Section 1983 does not contain a statute of limitations. Thus, to determine the timely filing of a § 1983 claim, courts borrow the statute of limitations from the most analogous state-law cause of action. See 42 U.S.C. § 1988(a). For § 1983 suits, that cause of action is a personal-injury suit. See Owens v. Okure, 488 U.S. 235, 249–50 (1989). Maryland law affords plaintiffs three years to file a personal-injury action. See Md. Code Ann., Cts. & Jud. Proc. § 5-101. Hence, a three-year limitations period applies to Owens's claims.

The parties agree that Owens had three years to file his § 1983 action. They disagree, however, as to the date on which this three-year limitations period began to run. Appellees contend that the three-year clock on Owens's claims began to run on June 4, 2007, the date on which the state court vacated his

11

conviction and granted him a new trial. Appellees' Br. 24. Because Owens filed suit more than three years after this date (on October 12, 2011), the Appellees maintain that all of Owens's claims are time barred. Id. Owens, by contrast, maintains that the statute of limitations for his claims did not begin to run until October 15, 2008 -- the date on which prosecutors filed a nolle prosequi, finally resolving the proceedings against him. Appellant's Br. 22. Because he filed suit within three years of this date, Owens contends that he met the operative deadline.

Although state law determines the applicable statute of limitations for § 1983 claims, federal law governs the date on which that limitations period begins to run. Wallace v. Kato, 549 U.S. 384, 388 (2007). Federal law, in turn, "conform[s] . . . to common-law tort principles" for purposes of determining this date. Id. "Under those principles, it is the standard rule that accrual occurs when the plaintiff has a complete and present cause of action" against a defendant -- that is, when the plaintiff knows or has reason to know of his injury. Id. (internal quotation marks and brackets omitted).

In Wallace, however, the Supreme Court recognized that limitations on common-law torts do not always begin on the date that a plaintiff knows or has reason to know of his injury. Wallace, 549 U.S. at 388. Accordingly, it found that the

12

"standard rule" does not always control the start of the limitations period for a § 1983 claim.  Id.; see also Devbrow v. Kalu, 705 F.3d 765, 767 (7th Cir. 2013) (relying on Wallace to hold that there is no "single accrual rule for all § 1983 claims").

Instead, the Wallace Court held that to determine the date of accrual for a particular § 1983 claim, a court must look to the common-law tort that is most analogous to the plaintiff's § 1983 claim and determine the date on which the limitations period for this most analogous tort claim would begin to run. Id.; see also Varnell v. Dora Consol. Sch. Dist., -- F.3d --, 2014 WL 2937039 (10th Cir. 2014) (noting that "[f]ollowing Wallace, we determine the accrual date of Plaintiff's claim by looking to the accrual date for the common-law tort most analogous to her § 1983 claim"); Devbrow, 705 F.3d at 767 (holding that a court "use[s] the [accrual] rule that applies to the common-law cause of action most similar to the kind of claim the plaintiff asserts").  For most common-law torts, a plaintiff's cause of action accrues, and the limitations period commences, when the plaintiff knows or has reason to know of his injury (hence, the "standard rule").  But if the common law provides a "distinctive rule" for determining when the limitations period for a particular tort begins to run, a court must "consider[]" this "refinement" in determining when the

13

limitations period for the plaintiff's analogous claim under § 1983 should commence. Wallace, 549 U.S. at 388.

In Wallace, the Supreme Court addressed a § 1983 claim alleging an unconstitutional detention by police officers. 549 U.S. at 388. The Court recognized the "standard rule" for accrual, but because it found the tort of false imprisonment to be the tort most analogous to the plaintiff's § 1983 claim, it considered the "common law's distinctive treatment" of that tort in determining the start of the limitations period for the plaintiff's § 1983 claim. Id.

The Court noted that Wallace could have brought his claim under § 1983 "immediately upon his false arrest." Id. at 390 n.3. This was so because Wallace's injury commenced at that date, and "a person falsely imprisoned has the right to sue on the first day of his detention." Id. (citation omitted). The Supreme Court went on to explain, however, that under the common law, the statute of limitations for false imprisonment does not begin to run at the outset of a plaintiff's false imprisonment; rather, limitations begin to run only at the end of a plaintiff's false imprisonment. Id. at 389. Deferring to the common law's "distinctive rule," the Court selected the date on which Wallace's false imprisonment ended -- not the date on which it began -- as the start of the operative limitations period. Id. at 391-92. With this start date established, the

14

Court held that Wallace's § 1983 claim accrued on the date that he was arraigned by a magistrate, i.e., the date on which his false imprisonment ended. Id.

Here, the parties acknowledge that, unlike in Wallace, false imprisonment is not the tort "most analogous" to Owens's § 1983 claims. Instead, they properly agree that the tort of malicious prosecution, which the Wallace Court recognized as an "entirely distinct" tort, provides the closest analogy to Owens's Brady-like claim. See Brady v. Maryland, 373 U.S. 83 (1963). Malicious prosecution redresses injuries a plaintiff sustains as a result of a defendant's improper initiation or maintenance of formal proceedings against him. See Lambert v. Williams, 223 F.3d 257, 260 (4th Cir. 2000). Because Owens contends that the Appellees violated due process by maintaining proceedings against him without disclosing exculpatory evidence, malicious prosecution provides the closest analogy to his § 1983 claims. Thus, following Wallace, we must determine the start date of Owens's § 1983 claims by looking to the start date of the common-law tort most analogous to his claims -- here, malicious prosecution.

Under the common law, the limitations period for a plaintiff's malicious prosecution claim commences when the proceedings brought against him are resolved in his favor. W. Page Keeton, et al., Prosser & Keeton on Torts § 119 (5th ed.

15

1984); see also 3 Dan B. Dobbs, et al., The Law of Torts § 590 (2d ed. 2011); 8 Stuart M. Speiser, et al., The American Law of Torts § 28.5 (2011); 1 Fowler V. Harper, et al., Harper, James, and Gray on Torts § 4.4 (3d ed. rev. 2006).  To satisfy this favorable-termination requirement, a plaintiff must show that the proceedings against him were favorably terminated "in such manner that [they] cannot be revived."  Keeton, et al. at § 119. "This is true, for example, of an acquittal in court, a discharge . . . upon preliminary hearing, [or] the entry of a nolle prosequi."  Id.; see also Speiser, et al. at § 28.5; Harper, et al. at § 4.4.  It is not true of "[a]ny disposition of the criminal action which does not terminate it but permits it to be renewed."  Keeton, et al. at § 119 (emphasis added). Under the common law, such terminations "cannot serve as the foundation for [a malicious prosecution] action," and thus, the limitations period for malicious prosecution claims does not begin to run until a truly final disposition is achieved.  Id.

The grant of a new trial does not terminate the proceedings against a defendant "in such a manner that [they] cannot be revived."  Keeton, et al. at § 119.  Rather, it provides a procedural victory, which simply postpones the proceedings' ultimate outcome.  See Harper, et al. at § 4.4 ("The termination in the plaintiff's favor must be a final one, and if the proceedings are immediately renewed for the same offense, they

16

are sufficient to bar plaintiff's action for malicious prosecution until they are finally determined.").

Because the grant of a new trial does not trigger the limitations period for a malicious prosecution claim, the statute of limitations on Owens's § 1983 claims did not begin to run on the date he was granted a new trial. Instead, the operative limitations period began to run on the date a malicious prosecution claim became ripe at common law, i.e., the date on which the nolle prosequi was entered. It was only on this date that proceedings against Owens were favorably terminated in such manner that they could not be revived. Because Owens filed suit within three years of this date, the statute of limitations does not bar his present cause of action.[2]

Contrary to the Appellees' suggestion, Heck v. Humphrey, 512 U.S. 477 (1994), does not require a different result. Heck held that a prisoner may not file suit under § 1983 as long as a § 1983 judgment in his favor would imply the invalidity of his

_____

[2] This is not to say that Owens could not have filed suit immediately upon his discovery of the Appellees' asserted suppression of material exculpatory evidence. See Wallace, 549 U.S. at 390 n.3; but see Heck v. Humphrey, 512 U.S. 477, 486-87 (1994) (holding that the date of accrual for a § 1983 claim is delayed if a § 1983 judgment in a plaintiff's favor would imply the invalidity of the plaintiff's criminal conviction). Although the statute of limitations did not begin to run until the proceedings against Owens were favorably and finally terminated, because he knew of his alleged injury before then, he was entitled to seek relief earlier. Wallace, 549 U.S. at 390 n.3.

criminal conviction. See id. at 487. In this case, as the Appellees point out, the Heck bar to suit was removed as soon as the state court invalidated Owens's conviction and granted him a new trial. But contrary to the Appellees' contention, removal of the Heck bar did not compel Owens immediately to proceed under § 1983. This is so because the statute of limitations for the most analogous common-law tort, malicious prosecution, did not begin to run until the proceedings against Owens were finally terminated in his favor and could not "be revived," Keeton, et al. at § 119, i.e., when the prosecutor filed the nolle prosequi. Up until this point, Owens remained imprisoned, and the prosecutor could -- and for sixteen months did -- proceed against him without the need to seek reindictment.

The partial dissent recognizes that Heck does not resolve the statute-of-limitations issue before us. It nonetheless maintains that Owens's claims are time barred because, in the dissent's view, the statute of limitations on Owens's § 1983 claims began to run when he was granted a new trial, or when he possessed sufficient facts to know about the Appellees' illegal suppression of evidence, i.e., whenever Owens could have brought his Brady-like claim.

The dissent both acknowledges that, in determining the start date of Owens's § 1983 claims, a court must look to malicious prosecution as the closest "common law analogue," and

18

recognizes that the date of favorable termination is the date triggering the onset of limitations for a malicious prosecution claim. But the dissent maintains that we adhere too closely to the malicious prosecution analogue. In the dissent's view, a court should consider the "underlying purpose of the elements of the common law analogue" and borrow this onset date for a § 1983 claim only if doing so would serve that underlying purpose. Because the dissent concludes that borrowing the onset date for malicious prosecution would not serve this underlying purpose, it believes we should not borrow its onset date here.

We recognize the important distinctions between malicious prosecution torts and Owens's Brady-like claims. But we cannot agree with the dissent that those distinctions somehow permit us to jettison the common law date on which limitations begin to run in determining the date on which limitations begin to run for an analogous § 1983 claim. Neither precedent nor logic permits this result.

The common law does act as a mere "starting point" in "defining the elements of damages and the prerequisites for their recovery" under § 1983. Carey v. Piphus, 435 U.S. 247, 257-58 (1978) (emphasis added). But the dissent cites no case in which the Supreme Court has used the common law as merely the "starting point" in resolving a statute-of-limitations question in a § 1983 action. This is so because the Court has never

19

sanctioned such an approach. Rather, in resolving the precise question at issue here -- when the statute of limitations for a § 1983 claim begins to run -- the Wallace Court applied the distinctive common law rule for the most analogous tort. 549 U.S. at 388-89 ("[T]o determine the beginning of the limitations period in this [§ 1983] case, we must determine when petitioner's false imprisonment came to an end."). Moreover, in Heck, the majority expressly relied on malicious prosecution's favorable termination requirement to delay the accrual of the plaintiff's Brady-based § 1983 claim. Heck, 512 U.S. at 484.[3] That the Supreme Court would require courts to analogize to the tort of malicious prosecution for purposes of delaying the onset of a Brady claim, yet eschew the very same analogy for purposes of calculating the onset of limitations for a Brady claim, strikes us as exceedingly unlikely. Accordingly, we cannot endorse the partial dissent's analysis.

Furthermore, even if, as the dissent argues, a court should consider the policy and "underlying purpose of the elements of the common law analogue" to determine when the statute of limitations begins to run, we would reach the same result. For

---

[3] In doing so, the Supreme Court majority expressly rejected the suggestion in Justice Souter's concurring opinion that the Court had adhered too closely to the common law analogue. Heck, 512 U.S. at 484 n.4. Yet it is precisely this argument from Justice Souter, rather than the majority's reasoning, on which the dissent relies in criticizing us.

20

the "strong judicial policy against the creation of conflicting resolutions arising out of the same or identical transaction" furthered by malicious prosecution's favorable termination requirement, Heck, 512 U.S. at 484, is also implicated in the Brady context. By setting different dates for the beginning of the limitations period for a claimant's § 1983 Brady claim on the one hand, and his malicious prosecution claim on the other, the dissent would permit a claimant to bring a state claim (based on the same conduct) long after the time for bringing the § 1983 claim had expired. The limitations period on the § 1983 claim might even have run before the state claim ever ripened, forcing a claimant to bring separate actions that could produce different and potentially conflicting results. Thus the dissent's approach would hardly accord with the "strong judicial policy against the creation of conflicting resolutions." Id.

In sum, we take the Supreme Court at its word. We determine when the statute of limitations on a plaintiff's § 1983 claim begins to run by looking to the common-law tort most analogous to the plaintiff's claim. In general, the limitations period for common law torts commences when the plaintiff knows or has reason to know of his injury. But if the common law provides a "distinctive rule" for determining the start date of the limitations period for the analogous tort, a court should consider this rule in determining when the

limitations period for the plaintiff's claim begins to run. Wallace, 549 U.S. at 388-89. Application of this rule to Owens's claims sets the start of the limitations period at the date of the nolle prosequi. Because Owens filed suit within three years of this date, his claims were timely filed.

## III.

Even if Owens's suit is timely, the Baltimore City State's Attorney's Office contends that the suit must be dismissed as to it because it is not an entity capable of being sued.[4]

The Federal Rules of Civil Procedure provide that the law of the state in which the district court sits determines an entity's capacity to be sued. Fed. R. Civ. P. 17(b). Maryland courts have had no occasion to address whether the Baltimore City State's Attorney's Office may be sued. But Maryland courts' treatment of analogous agencies confirms that the

---

[4] Relatedly, in his appellate brief, Assistant State's Attorney Brave contends that absolute prosecutorial immunity requires dismissal of the claims against him. Brave waived this defense, however, by failing to raise it in the district court. See Tully v. Barada, 599 F.3d 591, 594 (7th Cir. 2010); Collyer v. Darling, 98 F.3d 211, 222 (6th Cir. 1996). Moreover, because absolute immunity attaches to functions, not offices, see Harlow v. Fitzgerald, 457 U.S. 800, 808-09 (1982), the district court must determine whether Brave was performing prosecutorial functions at the time he allegedly committed the asserted constitutional violations, cf. Buckley v. Fitzsimmons, 509 U.S. 259, 273 (1993) (holding that absolute immunity does not attach to prosecutors performing "investigatory functions").

"Baltimore City State's Attorney's Office" is not a suable entity.

In Boyer v. State, Maryland's highest court made clear that, absent a statutory or constitutional provision creating a government agency, an "office" or "department" bears no unique legal identity, and thus, it cannot be sued under Maryland law. See 594 A.2d 121, 128 n.9 (Md. 1991). In Boyer, the court considered whether the "Charles County Sheriff's Department" was an entity amenable to suit. Id. It concluded:

> We are unaware of any statute, public general or public local, establishing an entity known as the Charles County "Sheriff's Department." The sheriff for each county is a constitutional officer under Art. IV, § 44, of the Constitution of Maryland. [But] [n]either the Constitution nor any other provision of law creates a governmental agency known as the "Sheriff's Department." Consequently, the motion for summary judgment on behalf of the Charles County 'Sheriff's Department' correctly asserted that the 'Sheriff's Department' is not an entity capable of being sued.

Id. (emphasis added).

Like the "Sheriff's Department" at issue in Boyer, no constitutional or statutory provision establishes a "Baltimore City State's Attorney's Office." The "State's Attorney" for each county and Baltimore City is a constitutional officer, but Maryland law creates no "State's Attorney's Office." Cf. Md. Const. art. V, § 7 ("There shall be an Attorney for the State in each county and the City of Baltimore, to be styled 'the State's

23

Attorney.'"); Md. Ann. Code, Crim. Proc. § 15-102 ("[A] State's Attorney shall, in the county served by the State's Attorney, prosecute and defend on the part of the State all cases in which the State may be interested.").

Indeed, Maryland law delegates many of the functions a hypothetical "State's Attorney's Office" would perform to a separate "Office of the State's Attorney's Coordinator." See id. § 15-302 (describing the functions of the Office of the State's Attorney's Coordinator, including training each State's Attorney's professional staff and performing legal research). Unlike the "Baltimore City State's Attorney's Office," the "Office of the State's Attorney's Coordinator" is expressly created by statute. See id. § 15-301(a)(1) ("There is an office of State's Attorney's Coordinator."). That the Maryland General Assembly knew how to create such an office, yet failed to do so with respect to the "entity" here, confirms that the "Baltimore City State's Attorney's Office" bears no unique legal identity. Cf. Sosa v. Alvarez-Machain, 542 U.S. 692, 711 n.9 (2004) ("[W]hen the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended." (internal quotation marks omitted)).

Owens notes that Title 15 of the Maryland Code of Criminal Procedure, which establishes the duties of a State's Attorney,

24

is entitled "Office of the State's Attorney."  Based on this title, Owens contends that the Maryland General Assembly has established a "State's Attorney's Office," which may be sued under Maryland law.  Reply Br. at 2.  This argument fails, however, for two reasons.  First, as the Supreme Court has long held, a statute's title provides little assistance to courts interpreting statutory provisions.  See, e.g., Bhd. of R.R. Trainmen v. Balt. & Ohio R.R. Co., 331 U.S. 519, 528-29 (1947) ("[T]he title of the statute and the heading of a section cannot limit the plain meaning of the text.  For interpretive purposes, they are of use only when they shed light on some ambiguous word or phrase.").  Second, even if we were to consider the title heading, it is clear that the title refers to the position of the State's Attorney, not a separate, suable office.  Undoubtedly, a plaintiff may sue the State's Attorney, i.e., the person who holds the position.  See S.C. State Ports Auth. v. Fed. Mar. Comm'n, 243 F.3d 165, 170 (4th Cir. 2001) ("[S]tate officers may be sued for money damages in their individual capacities, so long as relief is sought from the officer personally."), aff'd, 535 U.S. 743 (2002).  But the heading fails to establish the legal identity -- and thus the suability -- of a "State's Attorney's Office," separate and apart from the person who occupies the position or office.

25

Our friend's partial dissent suggests that the Maryland Constitution creates a "Baltimore City State's Attorney's Office" amenable to suit under Maryland law. But, in fact, nearly every provision of law cited for this proposition regulates the State's Attorney, not a State's Attorney's Office. See, e.g., Md. Const. art. V, § 9 ("The State's Attorney shall perform such duties and receive such salary as shall be prescribed by the General Assembly." (emphasis added)); id. ("[T]he State's Attorney for Baltimore City shall have the power to appoint a Deputy and such other Assistants as the Supreme Judicial Bench of Baltimore City may authorize or approve . . . . " (emphasis added)); see also Md. Code Ann., Crim. Proc. § 15-102 ("[A] State's Attorney shall, in the county served by the State's Attorney, prosecute and defend on the part of the State all cases in which the State may be interested." (emphasis added)). Far from establishing a State's Attorney's Office, these provisions create and administer the position of State's Attorney –- a position Owens could have reached, but did not, by suing the Baltimore City State's Attorney in his individual or official capacity.

To be sure, close inspection of Maryland's Constitution does reveal a passing reference to "the office of the State's Attorney." Md. Const. art. V, § 9 ("[E]xpenses for conducting the office of the State's Attorney . . . shall be paid by the

26

Mayor and City Council of Baltimore to the extent that the total of them exceeds the fees of his office."). But this passing reference to an "office" seems to us nothing more than shorthand for the position of State's Attorney. Moreover, the reference fails to distinguish the case at hand from Boyer. For there, although the Maryland Code made a passing reference to the Charles County "Sheriff's department," Maryland's highest court held that Maryland law failed to "establish[] an entity known as the Charles County 'Sheriff's Department.'" 594 A.2d at 128 n.9; see Md. Code Ann., Local Gov't § 12-203(b)(1) (formerly Md. Code, art. 25, § 3) ("The County Commissioners of Charles County shall establish a separate pension plan for sworn employees of the Charles County Sheriff's department . . . ." (emphasis added)). To remain faithful to the court's analysis in Boyer, we must similarly hold that the "Baltimore City State's Attorney's Office" is not a suable entity.

In conclusion, we hold that the "Baltimore City State's Attorney's Office" is a term of convenience only. It refers to the collection of government employees who work under the supervision of the Baltimore City State's Attorney. It is not an entity amenable to suit.[5]

---

[5] Because we hold that the Baltimore City State's Attorney's Office is not a suable entity, we do not address its alternative argument, i.e., that the State's Attorney's Office is an arm of
(Continued)

27

IV.

We next consider the qualified-immunity defense asserted by Officers Pelligrini, Dunnigan, and Landsman.

Qualified immunity protects government officials from liability for "civil damages insofar as their conduct does not violate clearly established . . . rights of which a reasonable person would have known." Harlow, 457 U.S. at 818. The doctrine is designed to square two important interests: "the need to hold public officials accountable when they exercise [their] power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson v. Callahan, 555 U.S. 223, 231 (2009).

---

the State entitled to sovereign immunity. We note, however, that the partial dissent focuses its arm-of-the-State analysis on a single factor -- whether a judgment against the Baltimore City State's Attorney's Office would be paid by the City of Baltimore -- to conclude that the State's Attorney's Office lacks immunity from suit. Although the Supreme Court had previously regarded this factor as the most important, it has subsequently abandoned this view. See Fed. Maritime Comm'n v. S.C. Port Auth., 535 U.S. 743, 765 (2002); U.S. ex rel. Oberg v. Ky. Higher Educ. Student Loan Corp., 681 F.3d 575, 580 n.3 (4th Cir. 2012). Accordingly, when engaging in an arm-of-the-State analysis, a court must also consider at least three other factors -- the degree of autonomy exercised by an entity, whether an entity is involved with state concerns, and how an entity is treated under state law -- without giving preeminence to any single factor. See Oberg, 681 F.3d at 580.

28

Qualified immunity protects public officials from suit when the state of the law is such that they would not have known that their conduct violates statutory or constitutional rights. Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2083 (2011). See, e.g., Pinder v. Johnson, 54 F.3d 1169, 1177–78 (4th Cir. 1995) (en banc). The defense does not shield officials, however, when they have acted "incompetent[ly]" or have "knowingly violate[d] the law." Malley v. Briggs, 475 U.S. 335, 341 (1986). See, e.g., Occupy Columbia v. Haley, 738 F.3d 107, 125 (4th Cir. 2013); Brockington v. Boykins, 637 F.3d 503, 507–08 (4th Cir. 2011); Ridpath v. Bd. of Governors Marshall Univ., 447 F.3d 292, 321 (4th Cir. 2006).

To establish a qualified-immunity defense, a public official must demonstrate that (1) a plaintiff has not alleged or shown facts that "make out a violation of a constitutional right," or that (2) "the right at issue was [not] 'clearly established' at the time of" its alleged violation. Pearson, 555 U.S. at 232.

A qualified immunity defense can be presented in a Rule 12(b)(6) motion, but, as the Second Circuit has noted, when asserted at this early stage in the proceedings, "the defense faces a formidable hurdle" and "is usually not successful." Field Day, LLC v. Cnty. of Suffolk, 463 F.3d 167, 191–92 (2d Cir. 2006). This is so because dismissal under Rule 12(b)(6) is

29

appropriate only if a plaintiff fails to state a claim that is plausible on its face. Iqbal, 556 U.S. at 678. A claim has "facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. To satisfy the standard, a plaintiff must do more than allege facts that show the "sheer possibility" of wrongdoing. Id. The plaintiff's complaint will not be dismissed as long as he provides sufficient detail about his claim to show that he has a more-than-conceivable chance of success on the merits. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2006).

On the one hand, Owens alleges that Officers Pelligrini, Dunnigan, and Landsman violated his clearly established constitutional rights by acting in bad faith to suppress material evidence supporting his innocence. On the other hand, the Officers maintain, and the district court held, that Owens has not pled a plausible claim, Appellees' Br. at 41-42, and that even if he has, the rights he asserts were not clearly established in 1988 -- the date of their alleged violation, id. at 29-40. We address each argument in turn.

A.

In 1963, the Supreme Court held in Brady v. Maryland, 373 U.S. 83, 87 (1963), that prosecutors' suppression of evidence "favorable to an accused" violates the Due Process Clause when

30

the evidence proves "material either to guilt or to punishment." A year after Brady, we concluded that police officers' suppression of evidence also violates the Constitution. See Barbee v. Warden, Md. Penitentiary, 331 F.2d 842, 846–47 (4th Cir. 1964). Specifically, in Barbee, we found that a police officer's failure to disclose exculpatory evidence to a prosecutor violates a defendant's due process rights. Id. at 847. "It makes no [constitutional] difference," we explained, "if the withholding [of evidence] is by officials other than the prosecutor. The police are also part of the prosecution and the taint on the trial is no less if they, rather than the State's Attorney, were guilty of the nondisclosure." Id. at 846; see also Strickler v. Greene, 527 U.S. 263, 280–81 (1999) ("[Brady] encompasses evidence known only to police investigators and not to the prosecutor." (internal quotation marks omitted)). In Goodwin v. Metts, 885 F.2d 157, 163–64 (4th Cir. 1989), we reaffirmed our Barbee decision, holding that a police officer violates a criminal defendant's constitutional rights by withholding exculpatory evidence from prosecutors.

To make out a claim that the Officers violated his constitutional rights by suppressing exculpatory evidence, Owens must allege, and ultimately prove, that (1) the evidence at issue was favorable to him; (2) the Officers suppressed the

31

evidence in bad faith;[6] and (3) prejudice ensued.  See Monroe v. Angelone, 323 F.3d 286, 299–300 (4th Cir. 2003).  Prejudice ensues if "there is a reasonable probability" that the jury would have reached a different result had the evidence been properly disclosed.  United States v. Bagley, 527 U.S. 667, 682 (1985).  The adjective "reasonable" is important in this context.  See Kyles v. Whitley, 514 U.S. 419, 434 (1995).  As the Supreme Court has explained, "[t]he question is not whether the defendant would more likely than not have received a different verdict" had the evidence been disclosed.  Id.  Rather, the question is whether, in the absence of disclosure, the defendant "received a fair trial, understood as a trial resulting in a verdict worthy of confidence."  Id.

Owens alleges that Officers Pelligrini, Dunnigan, and Landsman, at the direction of ASA Brave, subjected Thompson, the State's star witness, to a lengthy mid-trial interrogation, in

---

[6] As recognized in Jean v. Collins, 221 F.3d 656, 660 (4th Cir. 2000) ("Jean II") (Wilkinson, C.J., concurring), police officers and prosecutors have different obligations with respect to the disclosure of exculpatory evidence.  Under Brady, a prosecutor violates the Constitution whenever he fails to disclose material, exculpatory evidence, even if the nondisclosure was purely accidental.  See 373 U.S. at 87.  The Sixth Circuit has applied this same absolute standard to police officers.  See Moldowan v. City of Warren, 578 F.3d 351, 388–89 (6th Cir. 2009).  But other courts have followed the lead of Jean II to conclude that police officers commit constitutional violations only when they suppress exculpatory evidence in bad faith.  See Porter v. White, 483 F.3d 1294, 1308 (11th Cir. 2007); Villasana v. Wilhoit, 368 F.3d 976, 980 (8th Cir. 2004).

which they threatened and cajoled him to change his testimony repeatedly so as to strengthen the State's then-"failing prosecution." Owens asserts that the Officers elicited from Thompson a succession of vastly different accounts of his and Owens's involvement in Ms. Williar's rape and murder. These accounts ranged from Thompson's insistence that he had nothing to do with the crimes, to his admission that he had broken into Ms. Williar's apartment (but stayed downstairs), to his contention that he had remained in the upstairs bathroom and only heard the assault on Ms. Williar, to his final story, in which he asserted that he had masturbated at the foot of the bed while Owens raped and killed Ms. Williar.

Moreover, Owens alleges that Thompson repeatedly changed his story only because the Officers provided additional details about the crime, which they pressured Thompson to incorporate so as to incriminate Owens more directly. When the interview ended, the Officers told ASA Brave only about the witness's last version of events. That is, Owens alleges that ASA Brave did not know (and so could not and did not tell defense counsel) that Thompson had offered several other accounts of the crimes, all of which conflicted with the iteration Thompson ultimately told the jury.

We have little difficulty concluding that Owens's allegations state a plausible § 1983 claim. First, the

33

information Officers Pelligrini, Dunnigan, and Landsman assertedly withheld from ASA Brave was favorable to Owens. Had the Officers properly disclosed Thompson's statements, his inconsistencies would have lent support to the contention advanced by Owens's defense that Thompson, not Owens, had raped and murdered Ms. Williar. At a minimum, the inconsistencies would have aided Owens in his attempt to discredit Thompson's testimony and sow reasonable doubt in the minds of the jurors. See Bagley, 473 U.S. at 676 (holding that Brady's duty to disclose evidence encompasses impeachment evidence).

Second, Owens has offered specific allegations as to the Officers' bad faith. He asserts that these experienced police officers willfully, consciously, and in bad faith "chose not to disclose" the multiple revisions to Thompson's statement that they elicited from him during their hours-long interrogation. Further, he alleges that the Officers told ASA Brave about the final version of the story almost as soon as the witness had said it. The temporal proximity between Thompson's succession of narratives and the Officers' report to the prosecutor lends support to the contention that Thompson's inconsistent narratives were fresh in the Officers' minds, and thus, the Officers' omissions were not accidental, but intentional and malicious.

34

Finally, Owens's allegations satisfy <u>Brady</u>'s materiality requirement. Owens asserts that Thompson was the State's "star witness," and that in post-trial proceedings, ASA Brave admitted that without Thompson, "the case could not have gone forward." Certainly, it is plausible that impeachment of such a key witness could have altered the outcome at trial. We emphasize that <u>Brady</u> does not require that disclosure <u>probably</u> would have modified a trial's result. <u>Strickler</u>, 527 U.S. at 289–90. On the contrary, it is enough that the suppression of evidence cast serious doubt on the proceedings' integrity. <u>Id.</u> If Owens can prove his allegations, they would certainly satisfy this requirement.[7]

---

[7] The Officers unpersuasively contend that Owens's <u>Brady</u> claim fails because he obtained his release from prison on the basis of newly discovered DNA evidence rather than the undisclosed <u>Brady</u> material. But contrary to the Officers' assertion, courts routinely consider the <u>Brady</u> claims of § 1983 plaintiffs exonerated on the basis of newly discovered DNA evidence. <u>See, e.g.</u>, <u>Holland v. City of Chicago</u>, 643 F.3d 248, 250, 255-56 (7th Cir. 2011). Moreover, adopting the Officers' rule would have the perverse effect of discriminating <u>against</u> innocent plaintiffs. For although a § 1983 plaintiff need not establish that he is actually innocent of the crime for which he was convicted, <u>see</u> <u>Strickler</u>, 527 U.S. at 289-90; <u>Poventud v. City of New York</u>, 750 F.3d 121, 133 (2d Cir. 2014) (en banc), if he <u>can</u> prove his innocence –- for example, because DNA evidence completely exonerates him –- the Officers' rule would prevent that plaintiff from recovering for the <u>Brady</u> violation that put him in prison. We see no reason to insulate from liability police officers who withhold exculpatory evidence in bad faith merely because unrelated DNA evidence later came to light proving the plaintiff's innocence.

B.

We next turn to the question of whether Owens's constitutional rights were "clearly established" in February and March 1988, when the Officers acted.

i.

For a right to be clearly established, its contours "must be sufficiently clear [such] that a reasonable official would [have] underst[ood] that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held [to be] unlawful." Hope v. Pelzer, 536 U.S. 730, 739 (2002). Rather, liability obtains if the state of the law is such that it would have been "apparent" to an officer that his conduct violated constitutional law. Anderson, 483 U.S. at 640.

In evaluating whether qualified immunity exists, we must keep in mind that it is the plaintiff's constitutional right that must be clearly established, not a plaintiff's access to a monetary remedy. Thus, a right does not become clearly established only if a plaintiff has successfully enforced it through a § 1983 action. Hope, 536 U.S. at 741. On the contrary, a right may be clearly established by any number of sources, including a criminal case, a statute, or the Constitution itself. See, e.g., id. (relying on the Eighth

36

Amendment to conclude that a right was clearly established); Collier v. Dickinson, 477 F.3d 1306, 1312 (11th Cir. 2007) (relying on a statute to determine that a right was clearly established); Cinelli v. Cutillo, 896 F.2d 650, 655 (1st Cir. 1990) (relying on habeas and criminal cases to determine that a right was clearly established).

Furthermore, to be clearly established, a right need not be one with respect to which all judges on all courts agree. Rather, "[i]f the unlawfulness is apparent, the fact that some court may have reached an incorrect result will not shield a defendant's violation of a clearly established right." See Wilson v. Layne, 141 F.3d 111, 122 (4th Cir.), aff'd, 526 U.S. 603 (1999). Thus, although judicial disagreement about the existence of a right is certainly a factor we consider in determining whether a right has been clearly established, see Pearson, 555 U.S. at 245, disagreement alone does not defeat a plaintiff's claim in every instance. The Supreme Court has never sanctioned such a rule, see, e.g., Hope, 536 U.S. at 745-46 (holding a right was clearly established and rejecting a qualified-immunity defense notwithstanding the contrary views of three dissenting justices and the court of appeals), and neither have we, see, e.g., Henry v. Purnell, 652 F.3d 524, 536–37 (4th Cir. 2011) (en banc) (rejecting a qualified-immunity defense over a three-judge dissent).

With these principles in mind, we consider whether the constitutional rights Owens asserts were clearly established as of February and March 1988, the time of the alleged violations.

ii.

As outlined above, the Supreme Court held in 1963 that a prosecutor may not suppress material exculpatory evidence during a defendant's criminal trial. Brady, 373 U.S. at 87. In Barbee, decided a year after Brady, we held that "[t]he police are also part of the prosecution," and thus, they too violate the Constitution if and when they suppress exculpatory evidence. 331 F.2d at 846.

In 1976, we applied Barbee's holding expressly to impeachment evidence. In both United States v. Sutton, 542 F.2d 1239 (4th Cir. 1976), and Boone v. Paderick, 541 F.2d 447 (4th Cir. 1976), we overturned a defendant's criminal conviction on the ground that police had suppressed exculpatory information bearing on the veracity of a witness's testimony. See Sutton, 542 F.2d at 1241 n.2, 1243; Boone, 541 F.2d at 453. As in Barbee, we reiterated that where "material evidence which tends to exculpate the defendant is not disclosed," the failure to disclose it "is not neutralized because it was in the hands of the police rather than the prosecutor." Boone, 541 F.2d at 450–51.

38

Finally, in Goodwin, 885 F.2d at 163-64, we applied Barbee's logic to § 1983 cases. See also Carter v. Burch, 39 F.3d 257, 263-64 (4th Cir. 1994). In Goodwin, we upheld a jury award of thousands of dollars against a South Carolina police officer who, in 1983, failed to disclose exculpatory evidence. In doing so, we rejected the officer's qualified-immunity defense because we determined that a "reasonable officer [acting in 1983] would have known that a prosecution carried out without . . . disclosure of exculpatory information would violate the constitutional rights of the criminal defendants." 885 F.2d at 164.[8] Goodwin thus capped an unbroken chain of circuit precedent affirming -- then reaffirming -- that criminal defendants' rights are violated by police officers' malicious suppression of evidence.

The partial dissent offers a different view. It maintains that the law was not clearly established in 1988 because the cases decided before that date -- Barbee, Sutton, and Boone -- imposed no independent obligation on police officers to disclose

---

[8] We were not alone. Other circuits have similarly held that by 1988, police officers violated the Constitution by suppressing exculpatory evidence in bad faith. See, e.g., McMillian v. Johnson, 88 F.3d 1554, 1569 (11th Cir. 1996) (discussing 1987 police action); Walker v. City of New York, 974 F.2d 293, 299 (2d Cir. 1992) (discussing 1971 police action); Jones v. City of Chicago, 856 F.2d 985, 995 (7th Cir. 1988) (discussing 1981-82 police action); Geter v. Fortenberry, 849 F.2d 1550, 1559 (5th Cir. 1988) (discussing 1982 police action).

exculpatory evidence.  The dissent insists that Barbee, Sutton, and Boone stand only for the proposition that "a police officer's knowledge of exculpatory evidence will be imputed to the prosecutor for Brady purposes."  This holding, the dissent contends, fails to notify police officers of their susceptibility to suit, and thus, the Officers in the case at hand enjoy qualified immunity.

We cannot agree.  Qualified immunity exists to ensure that "public officials performing discretionary functions [are] free to act without fear of retributive suits . . . except when they should have understood that particular conduct was unlawful." Limone v. Condon, 372 F.3d 39, 44 (1st Cir. 2004).  Ever since it first articulated the contours of modern qualified-immunity doctrine, the Supreme Court has emphasized that qualified immunity assesses the apparent unlawfulness of conduct.  See Harlow, 457 U.S. at 819 ("[W]here an official could be expected to know that certain conduct would violate statutory or constitutional rights . . . , a person who suffers injury caused by such conduct may have a cause of action." (emphasis added)); see also id. (explaining that qualified immunity provides "no license to lawless conduct" (emphasis added)); Mitchell v. Forsyth, 472 U.S. 511, 526 (1985) (explaining that qualified immunity concerns "whether the conduct of which the plaintiff complains violated clearly established law" (emphasis added)).

40

Barbee, Sutton, and Boone each held that certain conduct by police officers -- the suppression of material exculpatory evidence -- results in the violation of criminal defendants' rights. Whether or not an officer's knowledge is "imputed" to the prosecutor does not affect the lawfulness of the officer's own conduct. See Limone, 372 F.3d at 47 (rejecting police officers' argument that law was not clearly established because cases announcing plaintiff's constitutional right referenced "the State's" obligations, not those of police officers). Barbee, Sutton, and Boone taught police officers how to conform their conduct to the law. These cases each held that if a police officer suppresses material exculpatory evidence, courts will invalidate a defendant's criminal sentence as unconstitutional. A police officer acting after the issuance of these decisions, like each of the Officers here, could not have thought that the suppression of material exculpatory evidence would pass constitutional muster. See, e.g., Cinello, 896 F.2d at 655 (holding that police officers were on notice of constitutional right's existence because prior cases had invalidated criminal sentences based on similar misconduct).

Goodwin recognized this reality, and held in light of Barbee, Sutton, and Boone that a police officer's obligation to disclose material exculpatory evidence was clearly established by 1983, five years prior to the Brady violations alleged in

41

this case.  Yet the dissent suggests that our reliance on Goodwin retroactively subjects the Officers to liability.  Not so.  For although Goodwin issued after the Officers in this case acted, Goodwin announced no new rule of constitutional law.  Rather, it merely held, in light of the constitutional rule already established by Barbee, Sutton, and Boone, that a police officer's duty to disclose material exculpatory evidence was clearly established in 1983.  If a right was clearly established in 1983 (as Goodwin held), it must have been clearly established in 1988 (when the Officers acted).  To hold to the contrary would directly conflict with Goodwin.[9]

---

[9] In hopes of convincing us to the contrary, the Officers rely on Jean v. Collins, 155 F.3d 701 (4th Cir. 1998) ("Jean I"), vacated, 526 U.S. 1142 (1999), which they contend renders the state of our precedent uncertain.  That opinion, however, does not assist them.  Jean I addressed conduct that took place in 1982 -- predating the conduct we held unconstitutional in Goodwin, and six years before the conduct at issue in this case.  Moreover, soon after the issuance of Jean I, the Supreme Court vacated the decision for further consideration in light of Wilson v. Layne, 526 U.S. 603 (1999).  See Jean v. Collins, 526 U.S. 1142 (1999).  On remand, because the en banc court was equally divided, the district court's denial of relief was affirmed.  Those judges voting to affirm concluded that summary judgment was appropriate because the plaintiff had failed to offer sufficient evidence of the Officers' unconstitutional conduct.  Jean II, 221 F.3d at 663 (Wilkinson, C.J., concurring).  These judges nonetheless left intact Barbee, Sutton, Boone, and Goodwin, and expressly affirmed that "a police officer's actions in failing to turn over materially exculpatory evidence to a prosecutor" violates a criminal defendant's constitutional rights.  Id. at 659 (quotation marks and alterations omitted).

42

Indeed, if the dissent is correct and Barbee, Sutton, and Boone announced no rule of constitutional law applicable to police officers, then Goodwin was wrongly decided. For according to the dissent's view, Goodwin acted in the absence of any prior circuit precedent to hold that a constitutional right was clearly established and so a police officer did not enjoy qualified immunity. We cannot endorse such an extraordinary view of our precedent.

In sum, our precedent unmistakably provides that, by 1988, a police officer violates clearly established constitutional law when he suppresses material exculpatory evidence in bad faith. Accordingly, we hold that the Officers were clearly on notice of the impermissibility of their conduct in 1988, the time of the alleged violations.[10]

---

[10] The Officers unpersuasively rely on three unpublished post-1988 opinions to bolster their contention that the rights Owens asserts were not clearly established in 1988. But, as we have repeatedly explained, unpublished opinions are not precedent in this circuit. See, e.g., Hogan v. Carter, 85 F.3d 1113, 1118 (4th Cir. 1996) (en banc). Thus, these unpublished opinions cannot alter the clear rule set forth in the published opinions discussed above. Nor do they reflect the kind of judicial disagreement that makes qualified immunity appropriate. Just as a dissent does not articulate the law of the case, unpublished opinions do not articulate the law of the circuit. Both may reflect judicial disagreement about whether a right is in fact clearly established, but neither can displace the circuit's binding authority. Cf. Brockington, 637 F.3d at 507 (holding that unpublished decisions suggesting that no constitutional right was violated did not entitle a defendant to qualified immunity).

43

V.

Finally, we address whether Owens has stated a plausible claim against the BCPD.

A.

Section 1983 provides that "[e]very person," who, under color of state law causes the violation of another's federal rights shall be liable to the party injured by his conduct. See 42 U.S.C. § 1983. In Monell v. New York City Department of Social Services, 436 U.S. 658, 690 (1978), the Supreme Court held that municipalities qualify as "persons" under the statute, rendering them amenable to suit.

Unlike public officials, municipalities do not enjoy qualified immunity. See Owen v. City of Independence, 445 U.S. 622, 638 (1980). Accordingly, claims against municipalities are measured against current law, without regard to whether municipalities' obligations were clearly established at the time of the alleged violations. Id. at 634; see also Barber v. City of Salem, 953 F.2d 232, 237-38 (6th Cir. 1992).

For these reasons, the district court erred in dismissing Owens's claims against the BCPD on the basis of qualified immunity. Apparently recognizing this, the BCPD does not now contend that it has immunity. Rather, it argues that dismissal of the claim against it was nonetheless proper because Owens has assertedly "failed to plead sufficient facts" to set forth a

44

plausible Monell claim. Appellees' Br. 43. We turn to that argument.

## B.

Although municipalities, unlike public officials, cannot claim immunity from suit, the Supreme Court has expressly cabined their liability: under Monell, a municipality is liable only for its own illegal acts. See 436 U.S. at 691 (stating that a municipality "cannot be held liable solely because it employs a tortfeasor" (emphasis in original)); see also Connick v. Thompson, 131 S. Ct. 1350, 1359 (2011) ("[Municipalities] are not vicariously liable under § 1983 for their employees' actions."). Pursuant to this standard, a municipality is liable under § 1983 if it follows a custom, policy, or practice by which local officials violate a plaintiff's constitutional rights. Monell, 436 U.S. at 694. Only if a municipality subscribes to a custom, policy, or practice can it be said to have committed an independent act, the sine qua non of Monell liability.

Here, Owens alleges that the BCPD violated his federal constitutional rights pursuant to a municipal custom, policy, or practice. Specifically, he alleges that "[a]t all times relevant to this case," the BCPD "maintained a custom, policy, and/or practice" of condoning its officers' conduct in "knowingly, consciously, and repeatedly with[holding] and

45

suppress[ing]" exculpatory evidence. Owens's complaint thus alleges a theory of custom "by condonation." Spell v. McDaniel, 824 F.2d 1380, 1390 (4th Cir. 1987). Under this theory of liability, a city violates § 1983 if municipal policymakers fail "to put a stop to or correct a widespread pattern of unconstitutional conduct." Id. at 1389. Owens alleges that by failing to correct its officers' pervasive suppression of evidence, the BCPD injured him, committing an independent act that renders it liable under § 1983.

Prevailing under such a theory is no easy task. A plaintiff must point to a "persistent and widespread practice[]" of municipal officials," the "duration and frequency" of which indicate that policymakers (1) had actual or constructive knowledge of the conduct, and (2) failed to correct it due to their "deliberate indifference." Id. at 1386–91 (alterations omitted). Both knowledge and indifference can be inferred from the "extent" of employees' misconduct. Id. at 1391. Sporadic or isolated violations of rights will not give rise to Monell liability; only "widespread or flagrant" violations will. Id. at 1387.

Although prevailing on the merits of a Monell claim is difficult, simply alleging such a claim is, by definition, easier. For to survive a motion to dismiss under Rule 12(b)(6), a complaint need only allege facts which, if true, "'state a

46

claim to relief that is plausible on its face.'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 570) (emphasis added). The recitation of facts need not be particularly detailed, and the chance of success need not be particularly high. See Iqbal, 556 U.S. at 678; Twombly, 550 U.S. at 570. A plaintiff fails to state a claim only when he offers "labels and conclusions" or formulaically recites the elements of his § 1983 cause of action. Iqbal, 556 U.S. at 678.

In support of his claim, Owens alleges that "[r]eported and unreported cases from the period of time before and during the events complained of" establish that the BCPD had a custom, policy, or practice of knowingly and repeatedly suppressing exculpatory evidence in criminal prosecutions. He further alleges that "a number of motions were filed and granted during this time period that demonstrate that [the BCPD] maintained a custom, policy, or practice to allow this type of behavior either directly or . . . by condoning it, and/or knowingly turning a blind eye to it." The assertions as to "reported and unreported cases" and numerous "successful motions" are factual allegations, the veracity of which could plausibly support a Monell claim. That BCPD officers withheld information on multiple occasions could establish a "persistent and widespread" pattern of practice, the hallmark of an impermissible custom. Spell, 824 F.2d at 1386. If (but only if) the duration and

47

frequency of this conduct was widespread and recurrent, the BCPD's failure to address it could qualify as "deliberate indifference." Id. at 1391.

Urging a different result, the BCPD contends that Owens alleges nothing more than "unadorned, the-defendant-unlawfully-harmed-me accusation[s]." See Appellees' Br. 47 (quoting Iqbal, 556 U.S. at 678). We recognize, of course, that courts have dismissed Monell claims when the plaintiff has alleged nothing more than a municipality's adherence to an impermissible custom. But Owens has done more than that: Owens has alleged facts –– the existence of "reported and unreported cases" and numerous "successful motions" –– which, if true, would buttress his legal conclusion.

Owens's brief, but non-conclusory, allegations closely resemble those in Haley v. City of Boston, 657 F.3d 39 (1st Cir. 2011). There, a defendant was convicted of murder when two Boston police officers suppressed a witness's statement casting doubt on his guilt. Id. at 45. The defendant discovered this Brady material, and after thirty-four years in prison, obtained his release; he then sued the Boston Police Department under § 1983. The First Circuit reversed the district court's dismissal of the claim, holding that the defendant had stated a plausible Monell claim against the Boston Police Department in view of the "wholly unexplained" nature of its officers'

48

suppression of evidence and the alleged (but not identified in the opinion or record) "volume of cases" involving similar violations in the Boston Police Department. Id. at 53; see also Complaint, Haley v. City of Boston, 677 F. Supp. 2d 379 (D. Mass. 2009) (No. 1:09-cv-10197). The Haley court concluded that this "volume" of other cases documenting officers' suppression of evidence lent credence to the claim that policymakers "encouraged, or at least tolerated" an impermissible practice. Haley, 657 F.3d at 53. Accordingly, "[a]lthough [the complaint was] couched in general terms," the court concluded that the complaint nonetheless "contain[ed] sufficient factual content to survive a motion to dismiss." Id.

The same reasoning applies here. Of course, to prevail on the merits, Owens will have to do more than allege a pervasive practice of BCPD misconduct; he must prove it. But at this early stage in the proceedings, we must conclude that Owens has pled sufficient factual content to survive Rule 12(b)(6) dismissal.

VI.

For the reasons set forth above, we affirm the judgment of district court to the extent it dismisses Owens's claims against the Baltimore City State's Attorney's Office. We vacate the judgment in all other respects. We remand the case to the

49

district court for further proceedings consistent with this opinion.

AFFIRMED IN PART,
VACATED IN PART,
AND REMANDED

TRAXLER, Chief Judge, concurring in part and dissenting in part:

I concur in parts III, IV.A, and V of the majority opinion. However, I respectfully dissent from parts II and IV.B. First, I believe that Owens' Brady claims were untimely because they accrued when he discovered the exculpatory and impeaching evidence that had not been disclosed, not when the proceeding was subsequently terminated via entry of the nolle prosequi. Second, I would conclude that the district court correctly determined that the individual defendants were entitled to qualified immunity because it was not clearly established in the spring of 1988 that a police officer's failure to disclose exculpatory evidence made the officer potentially liable for a violation of a criminal defendant's constitutional rights.

I.

I turn first to the question of whether Owens' claims are completely time-barred. Because "[t]here is no federal statute of limitations for § 1983 claims, . . . the state limitations period which governs personal injury actions is applied." Lewis v. Richmond City Police Dep't, 947 F.2d 733, 735 (4th Cir. 1991) (per curiam); see Wallace v. Kato, 549 U.S. 384, 387 (2007). In this case, we apply Maryland's three-year limitations period for personal injury actions. See Md. Code Ann., Cts. & Jud. Proc. § 5-101. This much is beyond debate. When Owens' § 1983 claim accrued, however, is a more difficult question.

51

"[T]he accrual date of a § 1983 cause of action is a question of federal law that is not resolved by reference to state law." Wallace, 549 U.S. at 388. In addressing this very issue, the Supreme Court stated that the "standard rule" for determining the date a cause of action accrues is to determine "when the plaintiff has a complete and present cause of action, that is, when the plaintiff can file suit and obtain relief." Id. (internal quotation marks and citations omitted). Generally speaking, a federal claim "accrues when the plaintiff knows or has reason to know that the act providing the basis of his or her injury has occurred," and therefore "we typically determine the accrual of a § 1983 action by looking to the event that should have alerted the typical lay person to protect his or her rights." D'Ambrosio v. Marino, 747 F.3d 378, 384 (6th Cir. 2014) (internal alterations and quotation marks omitted); see Nasim v. Warden, Md. House of Corr., 64 F.3d 951, 955 (4th Cir. 1995) (en banc) (explaining that under federal law, a cause of action accrues "when the plaintiff possesses sufficient facts about the harm done to him that reasonable inquiry will reveal his cause of action."); cf. Wallace, 549 U.S. at 388 (observing that, under the standard rule, there can be no dispute that petitioner could have filed suit as soon as the allegedly wrongful arrest occurred . . . so that statute of limitations would normally commence to run from that date").

Owens' claim is based on the defendant police officers' failure to disclose exculpatory evidence—a due process claim that clearly arises pursuant to Brady v. Maryland. Thus, "application of the general rule would indicate that [plaintiff's § 1983] cause of action [based on Brady] accrued—and the limitations period began—when [plaintiff] discovered that the exculpatory evidence in question had not been disclosed to him." D'Ambrosio, 747 F.3d at 384 (emphasis added); see Julian v. Hanna, 732 F.3d 842, 849 (7th Cir. 2013). Owens clearly knew about at least some of the exculpatory evidence—specifically the fact that James Thompson gave police several different versions of his testimony before and during trial—as early as October 1989, when the Maryland Court of Special Appeals recounted the shifting testimony in an opinion affirming Owens' conviction. At the very latest, Owens was aware of the exculpatory and impeachment evidence at issue in this appeal in June 11, 2008, when his counsel filed a motion to exclude that evidence at his retrial and detailed the evidence discovered after the original trial.

But this does not end the analysis. In determining the accrual date of a § 1983 claim, we should consider the most analogous common-law cause of action as a guidepost. Assuming the most analogous common law tort is malicious prosecution, its "favorable termination" requirement constitutes a "distinctive

53

rule" of accrual that displaces the general rule that a claim accrues when the plaintiff knows or has reason to know of his injury.  See Wallace, 549 U.S. at 388.  Because the favorable-termination element "constitutes a prerequisite for recovery" on a malicious prosecution claim, it naturally "establishes the time from which the claim accrues").  See Lambert v. Williams, 223 F.3d 257, 262 n.3 (4th Cir. 2000).

I part ways with my friends in the majority on the application of the "favorable termination" requirement in this context.  The majority notes that in order to satisfy the favorable termination element of a malicious prosecution claim, the plaintiff must demonstrate that the criminal proceedings against him have been terminated in such a way that they cannot be revived.  See Poventud v. City of New York, 750 F.3d 121, 130-31 (2nd Cir. 2014) (en banc) ("Under the common law any final termination of a criminal proceeding in favor of the accused, such that the proceeding cannot be brought again, qualifies as a favorable termination for purposes of a malicious prosecution action.").  Following this approach, they conclude that the proceedings were not formally terminated until the nolle prosequi was entered.

In my view, the majority adheres a bit too rigidly to the common-law analogue rather than using it as a "starting point" that "provides a useful guidepost in making sense of alleged

54

constitutional injuries" for determining the contours of claims of constitutional violations under § 1983." Becker v. Kroll, 494 F.3d 904, 913-14 (10th Cir. 2007); see Heck, 512 U.S. at 493 (recognizing that the common law is a "'starting point' for the analysis under § 1983" but that our analysis should never be "slavishly derived" from the common law) (internal quotation marks omitted) (Souter, J., concurring); Carey v. Piphus, 435 U.S. 247, 258 (1978) (recognizing common-law tort rules as the "starting point for the inquiry under § 1983").

Indeed, it is appropriate to consider the underlying purpose of the elements of the common law analogue to determine whether they can be imported for accrual purposes under § 1983. See Heck, 512 U.S. at 484 (taking into account the purpose of the favorable termination requirement). The favorable termination requirement is intended to guard against "the possibility of the claimant . . . succeeding in the tort action after having been convicted in the underlying criminal prosecution, in contravention of a strong judicial policy against the creation of two conflicting resolutions arising out of the same or identical transaction." Kossler v. Crisanti, 564 F.3d 181, 187 (3d Cir. 2009) (en banc) (internal quotation marks omitted). Thus, this element is satisfied where a prior criminal case against the plaintiff has been disposed of in a way that indicates the plaintiff's innocence. See Murphy v.

55

Lynn, 118 F.3d 938, 948 (2d Cir. 1997); see Restatement (Second) of Torts § 660 cmt. a; see also Taylor v. Gregg, 36 F.3d 453, 456 (5th Cir. 1994) (per curiam); Uboh v. Reno, 141 F.3d 1000, 1004 (11th Cir. 1998).

This reasoning makes little sense when considering the accrual date for Brady claims under § 1983. For a Brady claim, the plaintiff need only demonstrate "that prejudice resulted from the suppression." Vinson, 436 F.3d at 420. "[A] defendant's right to pre-trial disclosure under Brady is not conditioned on his ability to demonstrate that he would or even probably would prevail at trial if the evidence were disclosed, much less that he is in fact innocent." Poventud, 750 F.3d at 133 (internal quotation marks omitted). Brady is meant to ensure a fair trial; "[t]he remedy for a Brady claim is therefore a new trial, as proof of the constitutional violation need not be at odds with [defendant's] guilt." Id.; see id. ("[T]he remedy for a Brady violation is vacatur of the judgment of conviction and a new trial in which the defendant now has the Brady material available to [him].");  accord Julian, 732 F.3d at 849 ("Unlike [a] malicious prosecution claim, [a] Brady claim may have accrued when [the criminal defendant/§ 1983 plaintiff] was granted a new trial . . . before the charges against him were dropped; and ordinarily a Brady claim does not accrue until that happens. But although [plaintiff's] ordeal was not over

56

(because he was subject to being retried), his <u>Brady</u> claim was ripe. The exculpatory evidence had been revealed; the harm the alleged <u>Brady</u> violation had done could not be affected by a retrial." (internal citations omitted)).[1]

Accordingly, I would conclude that the proceedings were "favorably terminated" when Owens' conviction was vacated and he was granted a new trial on June 7, 2007. The <u>Brady</u> violation was complete; "the harm the alleged Brady violation had done could not be affected by a retrial." <u>Julian</u>, 732 F.3d at 849 His claim was therefore ripe and, assuming he knew about the undisclosed exculpatory evidence in question at that point, the limitations period began running at that time. Alternatively, as previously noted, Owens at the latest was aware of the exculpatory evidence by June 11, 2008, when his attorney filed a motion to exclude that evidence at his retrial. Either way, Owens' claims are untimely.

---

[1] In finding my position unfaithful to the judicial policy against the creation of conflicting resolutions, my colleagues incorrectly assume that if a <u>Brady</u> claim and a malicious prosecution claim produce different results, they will have produced conflicting results. But that is not so for reasons I have already suggested. A <u>Brady</u> claim under § 1983 seeks relief, regardless of the plaintiff's guilt or innocence, for the deprivation of a fair trial as a result of the prosecution's failure to disclose exculpatory evidence. A malicious prosecution claim seeks to remedy the seizure of the plaintiff pursuant to legal process that was unsupported by probable cause. It would be perfectly consistent to succeed on a <u>Brady</u> claim but fail on a malicious prosecution claim.

II.

As discussed above, I believe Owens' claims are time-barred. But even if the claims were timely filed, I believe his claims against the individual officers fail on qualified immunity grounds. To satisfy the "clearly established" prong of the qualified immunity analysis, "a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Reichle v. Howards, 132 S. Ct. 2088, 2093 (2012) (alterations and internal quotation marks omitted). That is, "existing precedent must have placed the statutory or constitutional question beyond debate." Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2083 (2011). "This clearly established standard protects the balance between vindication of constitutional rights and government officials' effective performance of their duties by ensuring that officials can reasonably anticipate when their conduct may give rise to liability for damages." Reichle, 132 S. Ct. at 2093 (emphasis added) (alteration and internal quotation marks omitted). In applying the "clearly established" standard, we "ordinarily need not look beyond the decisions of the Supreme Court, this court of appeals, and the highest court of the state in which the case arose. If a right is recognized in some other circuit, but not in this one, an official will ordinarily retain the immunity defense." Edwards v. City of Goldsboro, 178 F.3d 231, 251 (4th

58

Cir. 1999) (internal quotation marks, alterations, and citation omitted).  In deciding "whether the right at issue was clearly established <u>at the time of the officer's conduct</u>," <u>Meyers v. Baltimore Cnty., Md.</u>, 713 F.3d 723, 731 (4th Cir. 2013) (emphasis added) (internal quotation marks omitted), we are interested in relevant decisions that were <u>decided</u> before the conduct currently at issue occurred, not decisions announced afterward—even if those post-dated decisions involved underlying violations that occurred prior to the alleged violations in this case, <u>see</u> <u>Fields v. Prater</u>, 566 F.3d 381, 390 (4th Cir. 2009) (qualified immunity protects defendants from being "retroactively subject to significant penalties at law for which they did not have proper notice").

Owens was convicted by a jury in March 1988 and sentenced in April 1988.  Accordingly, for qualified immunity to be overcome, it must have been clearly established at least by early 1988 that a police officer violated a criminal defendant's due process rights by failing to furnish exculpatory evidence to a prosecutor.  <u>Cf.</u> <u>United States v. Smith Grading & Paving, Inc.</u>, 760 F.2d 527, 532 (4th Cir. 1985) ("No due process violation occurs as long as <u>Brady</u> material is disclosed to a defendant in time for its effective use at trial.").  Owens relies on a variety of decisions that both pre-date and post-date defendants' conduct in the spring of 1988.  In my view,

59

none of these decisions had placed the "constitutional question beyond debate," al-Kidd, 131 S. Ct. at 2083, by the late spring of 1988. Accordingly, I would affirm the district court's conclusion that the individual officers were entitled to qualified immunity.

### A. Decisions Pre-Dating April 1988

Owens contends that law enforcement officers have been on notice since this court's 1964 decision in Barbee v. Warden, Md. Penitentiary, 331 F.2d 842 (4th Cir. 1964), that an officer's failure to disclose exculpatory evidence to the prosecutor made the officer potentially liable for a violation of a criminal defendant's constitutional rights. In Barbee, we granted a defendant's habeas petition to set aside his conviction "because the prosecutor failed, either through lack of his personal knowledge or for some other reason, to disclose at the trial potentially exculpatory evidence in the possession of the police." Id. at 843. In doing so, the court rejected the idea that the state's failure to disclose exculpatory evidence was excused when the police failed to turn such information over to the state's attorney. Barbee therefore stands for the proposition that a police officer's knowledge of exculpatory evidence will be imputed to the prosecutor for Brady purposes. See United States v. Sutton, 542 F.2d 1239, 1241 n.2 (4th Cir. 1976) (reversing conviction for failure to disclose exculpatory

60

evidence despite prosecutor's lack of knowledge because "legally what [the officer] knew must be imputed to the prosecutor" (citing Barbee, 331 F.2d at 846)). Barbee simply did not establish that a law enforcement officer violates a defendant's due process rights by failing to turn over potentially exculpatory evidence to the prosecutor; see Jean v. Collins, 155 F.3d 701, 710 (4th Cir. 1998) (en banc) ("Jean I") (explaining that Barbee did not "impose[] a constitutional duty on police officers to give evidence to a prosecutor" but "held simply that the police's knowledge of such evidence would be imputed to the prosecutor in deciding whether the prosecutor had fulfilled his Brady duties"), vacated on other grounds, 526 U.S. 1142 (1999).

To the same effect is United States v. Sutton, which reversed a bank robbery conviction on direct appeal on the ground that the government failed to disclose exculpatory evidence. See 542 F.2d at 1240. The court reached this conclusion even though the prosecuting attorney apparently had no knowledge of such evidence, concluding that "legally what [the officer] knew must be imputed to the prosecutor." Id. at 1241 n.2. And Boone v. Paderick, also cited by the majority, granted habeas relief based on the prosecution's failure to disclose a law enforcement agent's promise of favorable treatment to a key government witness. See 541 F.2d 447, 448 (4th Cir. 1976). Boone even less clearly supports this

61

proposition as the prosecutor testified in the habeas proceedings that he did not deny that the officer told him of the promises and stated that he simply could not remember.

B. Decisions Post-Dating April 1988

Owens also relies on Goodwin v. Metts, a 1989 decision in which the court let stand a jury award against a police officer on a common law malicious prosecution cause of action. See 885 F.2d 157, 166-67 (4th Cir. 1989). Goodwin did not address any due process claims based on Brady. Owens' reliance on Goodwin is based on the court's statement that "[a] reasonable officer would have known [in 1983, when the salient events occurred,] that a prosecution carried out without probable cause or disclosure of exculpatory information would violate the constitutional rights of the criminal defendants." Id. at 164. Assuming Owens is correct that Goodwin puts officers on notice that they "could be liable for their failure to disclose exculpatory evidence," Brief of Appellant at 40, such notice was not provided until September 1989, when Goodwin was decided. Owens' trial took place between February and April 1988; thus, Goodwin would have been of no value to the defendant police officers in this case, whose failure to disclose evidence occurred before Goodwin was decided.

Owens makes much of the fact that the conduct at issue in Goodwin – for which the individual officers there were held

liable – happened in 1983.  But for purposes of determining "clearly established law" in the context of qualified immunity, the relevant precedents "can only be applied prospectively" and "cannot be imputed retroactively to an officer in this circuit whose allegedly tortious conduct predated" the decision in question.  Hill v. Crum, 727 F.3d 312, 322 (4th Cir. 2013).  Thus, it only matters when the case was decided, not when the underlying conduct occurred.[2]  As the next section demonstrates, our court later was sharply divided over the value of these cases to a plaintiff suing individual officers.

## C.  Jean v. Collins I & II

Both Owens and the individual defendants claim support from the two Jean v. Collins decisions.  These decisions reveal only that, even in 1998, this court was very much split over whether Barbee, Goodwin and Carter established that a police officer could be liable for his failure to disclose exculpatory information.  In Jean I, we affirmed the district court's conclusion that the defendant police officers were entitled to qualified immunity because "the relevant sources of law do not clearly establish that in 1982 police themselves labored under

---

[2]  Like Goodwin, Carter v. Burch, 34 F.3d 257 (4th Cir. 1994), was decided too late to be of any value to the officers in this case.  Carter upheld an award of nominal damages against a police officer who failed to disclose exculpatory evidence in connection with a trial occurring in March 1988; the court, however, did not decide Carter until 1994.

63

federal constitutional duties with respect to the disclosure of evidence to the prosecution." 155 F.3d at 712. Of particular relevance were the majority's observations regarding Barbee:

> We believe that Jean misapprehends the essential holding of Barbee. Barbee did not require police, as a constitutional matter, to furnish evidence to a prosecutor. Instead, as this circuit later explained, Barbee held simply that the police's knowledge of such evidence would be imputed to the prosecutor in deciding whether the prosecutor had fulfilled his Brady duties.

Id. at 710. Regarding Goodwin and Carter, the en banc court recognized that these decisions "now [in 1989] provide notice to police officers that they can be subject to monetary damages under section 1983 for failure to disclose exculpatory evidence to the prosecutor," but that because "[t]hese decisions . . . postdate the events in this case . . . we do not adopt the dissent's theory that proper notice to defendants can be notice after the fact." Id. at 710 n.3.[3]

On remand, the en banc court did not revisit the clearly established prong, again affirming, this time by an equally

---

[3] Thus, Jean I did not acknowledge that Goodwin and Carter provided such notice with respect to conduct occurring after 1982. Since Goodwin and Carter were decided in 1989 and 1994, respectively, it would not be possible for those decisions to afford notice with respect to conduct occurring prior to 1989.

Even though Jean I was vacated and remanded, see 526 U.S. 1142 (1999), for reconsideration in light of Wilson v. Layne, 526 U.S. 603, 609 (1999), the Supreme Court did not address Jean I's conclusion that, as of 1982, police had no constitutional duty to provide evidence to a prosecutor.

64

divided court, the district court's grant of summary judgment. See Jean v. Collins, 221 F.3d 656 (4th Cir. 2000) ("Jean II") The concurring opinion for affirmance, having concluded that there was no constitutional violation because the officer's failure to disclose was in good faith, took the position that that the Brady disclosure duty is one that rests with the prosecution rather than with the police . See id. at 660–62. By contrast, the dissenting opinion, arguing for reversal, assumed the contrary view that officers owe an independent duty under Brady to disclose exculpatory information. See id. at 664.

Although judicial unanimity is not required for a constitutional right to be clearly established, that the judges of this court so fervently disagreed in 1998 and 2000 about the existence, contours and scope of an officer's constitutional duty to disclose exculpatory evidence strongly suggests that the right was not clearly established at the time of Owens' trial in 1988. See Swanson v. Powers, 937 F.2d 965, 968 (4th Cir. 1991) ("Since qualified immunity is appropriate if reasonable officers could disagree on the relevant issue, it surely must be appropriate when reasonable jurists can do so." (citation omitted)); see also Wilson v. Layne, 526 U.S. 603, 618 (1999) ("If judges thus disagree on a constitutional question, it is

unfair to subject police to money damages for picking the losing side of the controversy.").

In sum, I would conclude that the defendant police officers are entitled to qualified immunity as it was not clearly established at the time they failed to disclose exculpatory evidence that police officers had a constitutional duty to disclose exculpatory evidence to criminal defendants. Accordingly, I respectfully dissent and vote to affirm the grant of qualified immunity to the individual officers.[4]

---

[4] My friends in the majority characterize as "extraordinary" my view that none of the decisions they cite—most notably Barbee, Sutton, Boone and Goodwin—placed the "constitutional question beyond debate," al-Kidd, 131 S. Ct. at 2083, for officers' conduct occurring prior to the issuance of Goodwin, the most recent of these. Given that more than half of the members of the en banc court in 1998 espoused this view, including two judges currently still sitting on the court, it is hardly a stunning or unsupportable one. See Jean v. Collins, 155 F.3d 701 (4th Cir. 1998) (en banc) (authored by Wilkinson, C.J., and joined by Niemeyer, J.), vacated on other grounds, 526 U.S. 1142 (1999).

WYNN, Circuit Judge, dissenting in part:

I agree with nearly all aspects of the thoughtful and well-reasoned majority opinion. The only issue on which I part ways with the majority is whether the Baltimore City State's Attorney's Office is an entity amenable to suit. I conclude that it is, and I would remand for the district court to fully consider whether the Baltimore City State's Attorney's Office is entitled to sovereign immunity. Accordingly, on this issue alone, I respectfully dissent.

I.

Rule 17(b) of the Federal Rules of Civil Procedure requires us to look to the "law of the state where the court is located" to determine whether an entity that is not an individual or a corporation has the capacity to be sued. Fed. R. Civ. P. 17(b)(3). I agree with the majority that Maryland's courts do not yet appear to have determined whether the Baltimore City State's Attorney's Office has the capacity to be sued. But a close look at the Maryland Constitution and the Maryland Criminal Procedure Code convince me that it is.

The Maryland Constitution establishes a State's Attorney for each county and for the City of Baltimore—and it goes further with specific provisions that apply only to "the State's Attorney for Baltimore City." Md. Const. art. V, § 9. For

67

example, the Constitution provides "that the State's Attorney for Baltimore City shall have the power to appoint a Deputy and such other Assistants as the Supreme Bench of Baltimore City may authorize or approve[.]" Id. Maryland's Constitution also specifies salaries for Baltimore's State's Attorney, Baltimore's Deputy State's Attorney, and Baltimore's Assistant State's Attorneys. Id. Finally, it states that the "expenses for conducting the office of the State's Attorney . . . shall be paid by the Mayor and City Council of Baltimore[.]" Id.

Not surprisingly, then, Maryland's Criminal Procedure Code acknowledges the existence of the "Office of the State's Attorney" that the Maryland Constitution created. Md. Code Ann. Crim. Proc. § 15. Not only is Criminal Procedure Code Title 15 named "Office of the State's Attorney,"[*] id., but it defines "State's Attorney" as "the individual holding that office under Article V, § 7 of the Maryland Constitution[,]" id. § 15-101.

---

[*] The majority opinion states that the title of the code section "provides little assistance to courts interpreting statutory provisions." Ante at 25. Although this is certainly a valid canon of construction, it has no relevance here for two reasons. First, we are not interpreting the Maryland Criminal Procedure Code itself; we are determining whether a particular thing—the Baltimore City State's Attorney's Office—has a distinct legal identity. Second, that particular canon of construction applies when the statute subject to interpretation contains "some ambiguous word or phrase." Bhd. of R.R. Trainmen v. Balt. & Ohio R.R. Co., 331 U.S. 519, 528–29 (1947). The majority points to nothing ambiguous in the statute that might trigger the application of that canon.

It sets forth all of the duties and powers possessed by that Office, id. §§ 15-102-109, and it distinguishes the Office of the State's Attorney from the Office of the State Prosecutor, which was established to be "an independent unit in the Office of the Attorney General." Id. § 14-102(a)(2).

Were this a case about a sheriff's department, I, too, would perceive the need to "remain faithful to the [Maryland Court of Appeals's] analysis in Boyer." Ante at 27. But this is a case about the Baltimore City State's Attorney's Office, not a sheriff's department. All the Boyer court concluded was that there is no such thing as the "Charles County 'Sheriff's Department,'" which was how the plaintiff in that case named the defendant in his complaint. Also, with one exception, the Boyer court consistently referred to the entity in that case as the Charles County "Sheriff's Department"—with quotation marks around "Sheriff's Department." It should come as no surprise, then, that the Boyer court determined that the Charles County "Sheriff's Department" is not a legal entity; after all, the Boyer court explained that they could find nothing "establishing an entity known as the Charles County "'Sheriff's Department.'" Boyer v. State, 594 A.2d 121, 128 n.9 (Md. 1991). In short, nothing in Boyer persuades me that the Maryland Court of Appeals used that case to set forth an analytical framework for

determining whether entities other than the Charles County Sheriff's Department are amenable to suit.

Unlike the majority, I do not read footnote 9 in <u>Boyer</u> to stand for the broad assertion of Maryland state law that "absent a statutory or constitutional provision creating a governmental agency, an 'office' or 'department' bears no unique legal identity, and thus, it cannot be sued under Maryland law." <u>Ante</u> at 23. Instead, that footnote explains why the Maryland Court of Appeals determined that the <u>Charles County Sheriff's Department</u> was not a governmental agency or a stand-alone legal entity capable of being sued. In other words, the absence of any mention of the <u>Charles County Sheriff's Department</u> either in the Maryland Constitution or in any other state statute confirms only the legal nonexistence of that particular department.

But even assuming for the sake of argument that footnote 9 in <u>Boyer</u> stands for the broad proposition that the majority opinion ascribes to it, I would still conclude that the Baltimore City State's Attorney's Office is a governmental agency amenable to suit for the reasons stated above. To reiterate, the Maryland Constitution clearly establishes the Baltimore City State's Attorney's Office, and the Maryland Criminal Procedure Code provides additional evidence of that Office's existence. Because I think that the Maryland

Constitution is clear, I find it outside of our purview to add our gloss to it.

The majority opinion suggests that the establishment of the Office of the State's Attorney's Coordinator provides evidence "[t]hat the Maryland General Assembly knew how to create such an office, yet failed to do so with respect to the" Baltimore City State's Attorney's Office. Ante at 24. The majority is persuaded that the absence of a similar statute creating the Baltimore City State's Attorney's Office "confirms" that the Office "bears no unique legal identity." Id. But "[a]s one court has aptly put it, '[n]ot every silence is pregnant.'" Burns v. United States, 501 U.S. 129, 136 (1991) (quoting Ill. Dep't of Pub. Aid v. Schweiker, 707 F.2d 273, 277 (7th Cir. 1983)), abrogated on other grounds by United States v. Booker, 543 U.S. 220 (2005). I conclude that a more reasonable interpretation of the fact that the Maryland General Assembly has not enacted a statute establishing the Baltimore City State's Attorney's Office is that the Maryland Constitution had already done so.

Finally, even if I thought that Maryland law was unclear on this point, I am not persuaded that the majority opinion captures the way that the Maryland Court of Appeals would rule on the issue. "The highest state court is the final authority on state law, but it is still the duty of the federal courts,

71

where the state law supplies the rule of decision, to ascertain and apply that law even though it has not been expounded by the highest court of the State." Fidelity Union Trust Co. v. Field, 311 U.S. 169, 177 (1940) (citations and footnote omitted). When the state law is unclear, we "must apply the law . . . as it appears the highest court of that state would rule." Brendle v. General Tire & Rubber Co., 505 F.2d 243, 245 (4th Cir. 1974) (emphasis added).

## II.

Because I would hold that the Baltimore City State's Attorney's Office is a legal entity capable of being sued, I would also reach the question of whether the district court erred in determining that the Baltimore City State's Attorney's Office is entitled to sovereign immunity. Although the Eleventh Amendment prevents plaintiffs from suing states and "arms of the state" in federal court, "Eleventh Amendment immunity does not extend to counties and similar municipal corporations[,] . . . even if [they] exercise a slice of State power." Cash v. Granville Cnty. Bd. of Educ., 242 F.3d 219, 222 (4th Cir. 2001) (quotations marks and citations omitted); Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978).

When an entity has both state and local characteristics, "the entity's potential legal liability" is relevant to the

Eleventh Amendment inquiry. Regents of the Univ. of Cal. v. Doe, 519 U.S. 425, 431 (1997). "Because the State treasury factor is 'the most salient factor in Eleventh Amendment determinations,' a finding that the State treasury will not be affected by a judgment against the governmental entity weighs against finding that entity immune." Cash, 242 F.3d at 224 (quoting Hess v. Port Auth. Trans-Hudson Corp., 513 U.S. 30, 48 (1994)). If the state would not be liable for judgment, courts consider several additional factors, including the amount of control that the state exercises over the entity, the scope of the entity's concerns, and the way in which state law treats the entity to determine whether sovereign immunity bars the lawsuit. Id.

In his opposition to Defendants' motion to dismiss, Owens argued that the Baltimore City State's Attorney's Office is not entitled to sovereign immunity because it is a "hybrid" governmental unit "created by State law but funded and overseen by a city or county government." J.A. 75. Furthermore, Owens attached exhibits to his opposition that show the State's Attorney on the City of Baltimore's organization chart and as a line item on the City's general fund budget. [J.A. 88–90.] Owens also specifically requested the opportunity to conduct discovery on the matter. J.A. 82.

But when it orally granted Defendants' motion to dismiss, the district court failed to analyze the case law discussed above or to explain why it was rejecting Owens's arguments in favor of Defendants' arguments. Further, the district court failed to give the parties a "reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). Instead, it simply declared that "based upon the arguments as well as the case law cited in the briefs in this case, . . . the State's Attorneys [sic] Office is a State agency and it certainly is entitled to [] sovereign immunity." J.A. 355.

In the end, I would reverse and remand the case to the district court with instructions to treat Defendants' motion to dismiss as a motion for summary judgment and to allow Owens to pursue reasonable discovery as to the sovereign immunity issue. See Plante v. Shivar, 540 F.2d 1233, 1235 (4th Cir. 1976).